UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA for the
use of SILVA'S EXCAVATION, INC., a
New Mexico Corporation,

        Plaintiff,

vs.                                                                                          No. CIV 07-0743 LCS/RHS

JIM COOLEY CONSTRUCTION, INC., an
Oklahoma Corporation, and WESTFIELD
INSURANCE COMPANY, an Ohio
Corporation

        Defendants.

## THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** came for a non-jury trial before the Honorable United States Magistrate Judge Leslie C. Smith on the 17th and 18th days of June, 2008.  Appearing for plaintiff, Silva's Excavation, Inc. ("Plaintiff") was Peter Schoenfeld, and appearing for defendants Jim Cooley Construction, Inc. ("Defendant Cooley") and Westfield Insurance Company ("Defendant Westfield") was Anton J. Rupert and Kelcey Nichols.  After having heard the testimony of the witnesses, reviewed the exhibits, and heard the statements and arguments of counsel, the Court hereby makes the following findings of fact and conclusions of law.

      1.      Plaintiff is a New Mexico corporation engaged in the business of land clearing, paving, and excavation in the State of New Mexico.  (Doc. 57 at 2.)

      2.      Defendant Cooley is a corporation organized and existing in Oklahoma and authorized to do business in New Mexico.  (*Id*.)

      3.      Defendant Westfield is and at all material times was an Ohio corporation, authorized to do business as an insurance services provider in New Mexico.  (*Id*.)

4.       On or about September 28, 2008, the United States of America, acting by the United States Postal Service, and Defendant Cooley entered into written contract, No. 482980-05-B-0938, whereby Defendant Cooley agreed to furnish all the labor and materials and perform all work required for the construction of the "United States Postal Service Carrier Annex at Taos, New Mexico 87571-998" ("the project").  (*Id*.)

5.       Defendant Westfield posted the Miller Act Bond for JCCI on the project.  (*Id*. at 3.)  The bond was duly accepted by the United States.  (*Id*.)

6.       Plaintiff and Defendant Cooley entered into Subcontract Agreement No. 20519-02000-S on December 5, 2005.  The full amount of the Subcontract was $103,147.00, and it was a fixed-fee contract.  (*Id*. at 2-3)  Later, a change order agreed to by the parties added the sum of $1,800 to the original agreement.  (Change Order, Trial Exhibit 6.)

7.       Plaintiff was a subcontractor to Defendant Cooley, and the labor, service, and materials furnished by Plaintiff were required to be performed and provided by Defendant Cooley, under its general contract with the United States Postal Service.  (Doc. 57 at 3.)

8.       Defendant Cooley paid Plaintiff $41,775 for work performed under the Subcontract.  (*Id*.)

9.       Plaintiff's scope of work under the Subcontract included, among other things, the "site cut and fill." (Subcontract, Exhibit 2 at Sections 2.1 and 17.2).  This is a construction contract term that means that the "high" areas of existing soil are "cut" off and removed, and the "low" areas of the existing soil are "filled."

10.       The Subcontract required Plaintiff to comply with all the contract documents; this included the Job Drawings, the Job Specifications, and the Geotechnical Engineering Report, which was discussed and adopted in the Job Specifications. (Subcontract, Exhibit 2 at Section 17.5).

11. The Geotechnical Report provided that: "Most of the over excavated soils is not suitable for use as fill material unless blended with granular material." (Geotechnical Report, Exhibit 5 at pg. 3, Section 4). It further specified that: "The plasticity index should be between 4 and 12 when tested . . ." (Geotechnical Report, Exhibit 5 at pg. 6, Section 4). It then said that: "Fill or backfill, consisting of soil approved by the Geotechnical Engineer, shall be placed in controlled compacted layers with approved compaction equipment." (Geotechnical Report, Exhibit 5, at pg. 6, Section 6). Thus, (1) most of the onsite soil was not regarded as appropriate for "fill," unless blended, (2) any "fill" used had to have a plasticity between 4 and 12, and (3) any "fill" had to be approved.

12. The Job Specifications further provided in Section 2315 (which specifically applied to the "dirt work" subcontractor) at subpart 3.5:

    A. Backfilling:

        1. Verify that imported off-site fill and stockpiled on-site material is tested
          and approved.

        (Job Specifications, Exhibit 5A, at page 2315-3, Section 3.5-A).

13. The Bertha Road site work (dirt work) was not excluded from the contract.

14. The December 28, 2005 report of AMEC (the testing laboratory) reported that a sample test pit of soil from the construction area had a plasticity of 18 and therefore did not meet the Geotechnical Report's approved range of 4 to 12. The December 28, 2005 report of AMEC reported that a 50/50 blend of native soil and imported soil had a soil plasticity of 7, which did meet the Geotechnical Report's approved range of 4 to 12. (AMEC reports, Trial Exhibit 11). These reports were forwarded to Plaintiff. (Trial Exhibit 12).

15. A February 10, 2006 Daily Inspection Report of AMEC (the testing company) reported that "tests were taken on the fill and cut areas of the west parking lot. The tests would

not pass." (AMEC 2-10-06 Report, Trial Exhibit 14).

16.    Thereafter, the Geotechnical Engineer, J.C. Rucker reported to the Architect that: ". . . it would appear that Silva Excavating, the excavation contractor for Cooley Construction on this project, was trying to utilize on site material for parking lot subgrade construction. It was known in advance that this on-site material was unsuitable for use in an unmodified/blended form. We need an assurance from the testing company (daily inspection report acceptable) that this original on-site material was removed, and replaced with off-site material, or blended in accordance with the soils report." (J.C. Rucker February 28, 2006 Memo, Trial Exhibit 15).

17.    Defendant Cooley made it clear to Plaintiff what action was necessary in order for Plaintiff to be in compliance with the contract.  (*See, e.g.*, Trial Exhibit 33.)

18.    On April 10, 2006, Mike Silva wrote to Defendant Cooley and agreed this his work had to meet the standards set in the Geotechnical Engineering Report (Trial Exhibit 5), but asserted that his work "met or exceeded" those standards. Mr. Silva's April 10, 2006 letter does not state what fill he used, whether it was 50/50 blend fill, or off-site fill. (Silva April 10, 2006 letter, Trial Exhibit 22).

19.    On May 4, 2006, Mr. Silva wrote again, this time asserting there was no fill; he stated: ". . . it is clear we had no need to fill for parking areas, but only cut in . . ." (M. Silva May 4, 2006 letter, Trial Exhibit 29).

20.    On May 5, 2006, Mr. Silva wrote again, this time stating that he used all imported fill; he stated: "This 50/50 import to native soil blend was what our company originally considered using for engineered fill for the structure, however because of the time of year and freezing temperatures, I decided to use all imported engineered fill . . ." (M. Silva May 5, 2006 letter, Trial Exhibit 30).

21.    Later, Mr. Silva answered that he re-used existing dirt to "fill" the parking area.

(Silva Answer to Interrogatory No. 6, Trial Exhibit 49).

22. On May 31, 2006, the testing company AMEC tested the parking lot "fill area" and found that it had a soil plasticity index of 16, which did not meet the standard set in the Geotechnical Report (Trial Exhibit 2) of between 4 and 12. (AMEC 5-31-06 tests, Trial Exhibit 35).

23. On June 7, 2006, the Owner's Architect, having received the May 31, 2006 soil tests, state that: "it appears that these soils, where tested, do not meet the specifications, as contained in the Project Manual. In particular, the Geotechnical Engineering report's recommendation for Site Grading (Page 5 and 6 of report) are not being met as these tested soils exceed the specified Plasticity Index." The Architect then directed that the fill soils placed by Plaintiff be removed; the Architect stated: "Thus, these soils should be removed and replaced . . ." (Architect's June 7, 2006 letter, Trial Exhibit 36).

24. During August, 2006, Plaintiff removed the fill soil that it had placed during February.

25. On September 6, 2006, Mr. Silva wrote a letter admitting that he had used fill soils; he stated: "Even though there had been issues with soils that were used in fill areas . . ." (M. Silva September 6, 2006 letter, Trial Exhibit 41).

26. Because of several inconsistencies in Mr. Silva's testimony and his manner while testifying, the Court finds his testimony wholly lacking in credibility. For example, Mr. Silva testified that the parking lot job was only cut and that there was only a small amount of fill in the northeast corner of the parking lot. Later, he remembered that there was also a substantial amount of fill in the southeast parking lot area. Also, Mr. Silva testified that 98% of the work was finished in February , 2006 and that he had approximately a half day of work left that could be delayed until the parking lot was ready (past completion of the building). However, he never

mentions this in his letters to Defendant Cooley, nor did he advise the Court that there was dispute going on from February until August.  In addition, the number of operator hours reported by Mr. Silva triples in Exhibit 47 – or at least is overstated by fifty percent.

27.	Plaintiff breached the contract by failing to use proper "fill" soil, and by failing to verify that the "fill soil it used was tested and approved by the Geotechnical Engineer." In fact, it was rejected by the Geotechnical Engineer.

28.	The contract dated effective December 5, 2005 required Plaintiff to post a Payment and Performance Bond. (Subcontract, Trial Exhibit 2, Section 9.8).

29.	The price for Plaintiff's work was increased by $2,319 from the $100,828 bid amount to the $103,147 contract amount in order to allow Plaintiff to pay the premium on the bond required by the contract. (Letter of Silva's counsel, Trial Exhibit 45; Cooley letter, Trial Exhibit 32).

30.	Plaintiff never provided a Payment Bond or a Performance Bond. (Silva Interrogatory Responses Nos. 2 and 4, Trial Exhibit 49; trial testimony).

31.	Plaintiff breached the contract by failing to provide a Bond.

32.	The Subcontract at Section 10.2.1 allows Defendant Cooley to terminate the Subcontract and cause a "conversion" of the contract from a lump sum to a "cost plus agreement" at Defendant Cooley's option for "any reason" but specifically including "Contractor dissatisfaction," and "Subcontractor initiated disputes." (Subcontract, Trial Exhibit 2 at Section 10.2.1).

33.	The above-described sequence of events, including the use by Plaintiff of "fill" that did not meet contract specifications, the multi-month delay before Plaintiff corrected the "fill," Plaintiff's repeated equivocations concerning the job, and the complete failure of Plaintiff to provide the contractually required Payment and Performance Bonds, engendered "Contractor

dissatisfaction" and constituted "Subcontractor initiated disputes."

34. Defendant Cooley did invoke its right to terminate the Subcontract for convenience and cause a "conversion" of the Subcontract to a "cost plus agreement." (Cooley letter terminating for convenience and agreeing to pay Plaintiff's costs plus overhead and profit, Trial Exhibit 43).

35. There existed a pattern of non-cooperation by Plaintiff with Defendant Cooley from April, 2006 until August, 2006.

36. Termination for convenience under Section 10 of the Subcontract was appropriate.

37. When Defendant Cooley caused the termination for convenience, it did not know what Plaintiff's costs were, and so Defendant Cooley requested Plaintiff's costs. (Cooley letter, Trial Exhibit 44).

38. Plaintiff responded (three months later) with an "invoice" dated December 7, 2006, purported that its costs on the $104,947 Subcontract, for which all the work was not even completed by Plaintiff was $153,183. (Invoice, Trial Exhibit 47). This invoice claimed labor hours on the job of approximately 900 hours, but the Certified Payrolls (that Plaintiff had to create as the job progressed, as required by federal law) show approximately 300 hours. (Certified Payroll, Trial Exhibit 46). Plaintiff's claim of $153,183 of costs is inherently unreliable and wholly lacks credibility. Even today, Plaintiff does not seek this amount. (Pretrial Order.)

39. Defendant Cooley has examined Plaintiff's payroll records, as well as the Daily Logs, and Plaintiff's load tickets and recreated Plaintiff's actual costs, plus overhead and profit. The actual amount is $73,475. (Trial Exhibit 48).

40. As of September, 2006, Defendant Cooley had paid Plaintiff $41,775 (Trial Exhibit 20).

41.     For purposes of determining Plaintiff's costs plus overheard and profit, the Court uses the number calculated by Defendant Cooley.  Plaintiff is entitled to the $31,700, calculated as follows: the $73,475 for Plaintiff's costs which includes overhead and profit, less the $41,775 already paid to Plaintiff ($41,775 + $31,700 = $73,475).

42.     Because the Court finds that Plaintiff is entitled to only $73,475, no offset is appropriate nor will any be awarded.

43.     Delay in the project by Defendant Silva's inaction is not compensable since the contract was terminated for convenience pursuant to Section 10 of the Subcontract.  Further, Defendant Cooley's calculations concerning delay are not credible.  The Court finds that Cooley has not sustained its burden of proof as to delay damages and therefore awards no delay damages.

44.     Plaintiff is entitled to judgment against Defendants in the amount of $31,700.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**